2004-NMSC-016

90 P.3d 491

**James GILL, Plaintiff–Petitioner,**

v.

**PUBLIC EMPLOYEES RETIREMENT BOARD OF the PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, Defendant–Respondent.**

**No. 27,823.**

Supreme Court of New Mexico.

April 28, 2004.

Rhodes & Salmon, P.C., Hazen H. Hammel, Albuquerque, NM, for Petitioner.

Hinkle, Hensley, Shanor & Martin, L.L.P., Dana Simmons Hardy, Ellen Casey, Santa Fe, NM, for Respondent.

## OPINION

BOSSON, Justice.

{1} In *Cockrell v. Board of Regents of New Mexico State University*, 2002–NMSC–009, 132 N.M. 156, 45 P.3d 876, we acknowledged New Mexico's constitutional sovereign immunity, derived from both the federal Constitution and recent U.S. Supreme Court precedent. We continue to clarify the contours of that immunity by defining the limit-

ed circumstances under which a state official may be sued for prospective, injunctive relief. Consistent with federal law and our obligations as a state under the federalist compact, we apply the doctrine of *Ex parte Young* to such actions as a limited exception to constitutional sovereign immunity. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

**BACKGROUND**

{2} In 1974, at the age of 49, James Gill joined the Hondo Volunteer Fire Department as a charter member. During his tenure, Gill served as an engineer, fireman, and Chief of the Department, and enjoyed all the benefits received by active members of the Department. After his retirement in February 1997, Gill applied for retirement benefits of $100 a month, based on his 22 years of service. *See* NMSA 1978, § 10–11A–5(B) (1983) (describing eligibility for retirement annuity). Shortly thereafter, the Public Employees Retirement Board (PERB), a state agency acting as the trustee for the various retirement funds handled by the Public Employees Retirement Association of New Mexico (PERA), denied Gill's claim for benefits, stating:

> Because you were over the age of 45 in 1979, the year in which you first could have acquired a service credit, YOU DO NOT QUALIFY to be a member and therefore, do not qualify for the benefits under the Volunteer Firefighters Retirement Act.

{3} The Volunteer Firefighters Retirement Act (VFRA) straightforwardly defines an eligible "member" as a volunteer firefighter whose first year of service credit was accumulated "no later than the year which he attained the age of forty-five." NMSA 1978, § 10–11A–2(E) (1983, amended 2003). Although the New Mexico legislature has amended Section 10–11A–2(E) (2003) to apply to volunteer firefighters whose first year of service credit was accumulated during or after the year the firefighter attained the age of 16, Gill's claim is not moot because the amended statute refers to "an active member on the rolls of a fire department" and makes no mention of retroactive effect. "[T]he general rule is that statutes apply prospectively unless the [l]egislature mani-

fests clear intent to the contrary." *Gallegos v. Pueblo of Tesuque,* 2002–NMSC–012, ¶ 33, 132 N.M. 207, 46 P.3d 668. As a result, the amended statute does not apply to current retirees, such as Gill.

{4} Gill filed charges with the Equal Employment Opportunity Commission (EEOC) and New Mexico Human Rights Division, and received a "Right to Sue" notice from the EEOC on February 28, 2000. Gill filed this lawsuit *pro se* and later retained counsel. Gill claims that Section 10–11A–2(E) of the VFRA violates the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 (2000), which prohibits arbitrary discrimination against employees who are at least 40 years old, based solely on age. *See* §§ 623(a), 631(a). Gill sued PERB for declaratory relief, and an injunction that would require PERB to discontinue enforcement of Section 10–11A–2(E), the statutory provision declaring him ineligible for retirement benefits based upon his age. In response to Gill's complaint, PERB filed a motion to dismiss asserting sovereign immunity, and Gill filed a cross motion for summary judgment. The district court agreed with PERB and granted its motion to dismiss. The Court of Appeals affirmed, holding that the state had not waived its constitutional sovereign immunity, and PERB, as a state agency, was immune from suit. *Gill v. Pub. Employees Ret. Bd.,* 2003–NMCA–038, ¶ 8, 133 N.M. 345, 62 P.3d 1227. The Court of Appeals rejected Gill's two principal theories: (1) that New Mexico's Declaratory Judgment Act, NMSA 1978, §§ 44–6–1 to –15 (1975, as amended through 2003), constituted a waiver of state sovereign immunity, and (2) that state courts can apply the *Ex parte Young* doctrine as a limited exception to state constitutional sovereign immunity so as to afford aggrieved citizens prospective equitable relief against state officials and curtail the violation of federal law. We agree with the Court of Appeals on the first point. However, for the reasons discussed below, we disagree with the Court of Appeals on its rejection of the *Ex parte Young* doctrine, which we regard as an important constitutional component to New Mexico's relationship with the United States Congress.

## DISCUSSION

### Federalism and State Constitutional Sovereign Immunity

{5} The subject of federalism, and specifically the balance between the powers of our national government and the powers of the several states, has been a source of debate throughout our nation's history. Recently, the United States Supreme Court has charted a new course, altering the federalist balance to extend the doctrine of state constitutional sovereign immunity and limit the power of Congress to abrogate, or override, that immunity. *See* Erwin Chemerinsky, *The Federalism Revolution,* 31 N.M. L.Rev. 7 (2001); Daan Braveman, *Enforcement of Federal Rights Against States: Alden and Federalism Non–Sense,* 49 Am. U.L.Rev. 611 (2000); *see also* U.S. Const. amend. XI.

{6} In its seminal opinion, *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court held that Congress can only authorize suits against non-consenting states when acting within its power under Section 5 of the Fourteenth Amendment, not under another source of constitutional authority such as the Commerce Clause. Section 5 of the Fourteenth Amendment contains an express grant of power authorizing Congress to enforce the Constitution "by appropriate legislation."

{7} Since that time, the Court has determined that a number of valid federal statutes could not be enforced against states, absent their consent, because Congress exceeded its power under Section 5 of the Fourteenth Amendment. For example, the Supreme Court determined that the ADEA, the statute at issue in this case, did not validly abrogate the states' constitutional sovereign immunity from suit so as to permit an aggrieved individual to enforce that statute against a state agency. *See Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (holding that Congress exceeded its Fourteenth Amendment, § 5 authority, in enacting the enforcement provisions of the ADEA). Accordingly, we start from the undeniable premise that, absent their consent, states may not be sued by private individuals in federal court to enforce rights granted them under the ADEA. *See also, e.g., Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (holding that Congress exceeded its Fourteenth Amendment, § 5 authority, by enacting the enforcement provisions of the Americans with Disabilities Act (ADA) to be applicable against the states).

{8} The Supreme Court has expanded the scope of state constitutional sovereign immunity to include such claims filed in state, as well as federal court. In *Alden v. Maine,* 527 U.S. 706, 711, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), probation officers filed a claim for overtime wages and damages against their state employer, pursuant to the federal Fair Labor Standards Act (FLSA). *See also* 29 U.S.C. §§ 201–219 (2000). The action against the state, initially brought in federal court, was dismissed after a determination that the FLSA did not abrogate the state's constitutional sovereign immunity. *Alden,* 527 U.S. at 712, 119 S.Ct. 2240. The probation officers then filed the same action in state court. *Id.* For the first time, the Supreme Court held that Congress also lacked the authority to subject a non-consenting state to an FLSA claim brought in state court. *Id.*

### Limitations on the State Constitutional Sovereign Immunity Recognized in *Alden*

{9} Although *Alden* expanded the doctrine of constitutional state sovereign immunity to actions in state courts, the United States Supreme Court limited the scope of that immunity and its exceptions. For example, a state may be sued when it consents to suit. Additionally, citizens may sue an entity that is not considered an "arm of the state." *Alden,* 527 U.S. at 756, 119 S.Ct. 2240. Thirdly, aggrieved citizens may sue state officers for prospective, injunctive relief through the *Ex parte Young* doctrine. *Id.* at 747, 119 S.Ct. 2240.

{10} These three exceptions to state constitutional sovereign immunity describe limited circumstances under which, in the opinion of the United States Supreme Court, a federal statutory claim does not unduly

encroach upon a state's autonomy or core sovereign interests. Thus, when the facts no longer support the very reason for constitutional sovereign immunity, then the doctrine must give way and state courts must allow claims to proceed in deference to federal law and the Supremacy Clause of the United States Constitution. "The principle of sovereign immunity as reflected in our jurisprudence strikes the proper balance between the supremacy of federal law and the separate sovereignty of the states." *Alden*, 527 U.S. at 757, 119 S.Ct. 2240; *see also* U.S. Const. art. VI, § 2 (Supremacy Clause). Although entitled to the immunity necessary to preserve their autonomy as separate sovereigns, states are bound to recognize the supremacy of the United States Constitution. "The good faith of the States thus provides an important assurance that '[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land.' " *Alden*, 527 U.S. at 755, 119 S.Ct. 2240 (*quoting* U.S. Const. art. VI). Thus, under the federalist compact, the obligation of states to respect federal law and rights created thereunder is an essential corollary of state sovereignty. *See Cockrell*, 2002–NMSC–009, ¶ 27, 132 N.M. 156, 45 P.3d 876 (acknowledging the state's duty to comply with federal law). "Even the most ardent advocate of federalism rejects the idea that states should be free to ignore or undercut constitutionally guaranteed individual liberties." Calvin Massey, *Federalism and the Rehnquist Court*, 53 Hastings L.J. 431, 440 (2002); *see also* Laura S. Fitzgerald, *Suspecting the States: Supreme Court Review of State-court State-law Judgments*, 101 Mich. L.Rev. 80, 81 (2002) (asserting that federal courts must now presume that state courts can be trusted to respect and apply federal law).

{11}  As noted above, one important limitation on sovereign immunity is a state's clear and unambiguous consent to suit. *See Cockrell*, 2002–NMSC–009, ¶ 24, 132 N.M. 156, 45 P.3d 876; *see also Alden*, 527 U.S. at 755–56, 119 S.Ct. 2240 (discussing how states have consented, through the ratification of the Constitution, to suits brought by the federal government or by other states). In this case, Gill contends that New Mexico

waived its sovereign immunity by enacting the Declaratory Judgment Act, which states that "the state of New Mexico, or any official thereof, may be sued and declaratory judgment entered when the rights, status or other legal relations of the parties call for a construction of the constitution of the state of New Mexico, the constitution of the United States or any of the laws of the state of New Mexico or the United States, or any statute thereof." Section 44–6–13. Gill's argument does not persuade us just as it did not persuade the Court of Appeals. The Declaratory Judgment Act does not have the effect of general consent to be sued; it merely permits parties to sue the state when the state's consent to be sued otherwise exists. *See In re Bogert's Will*, 64 N.M. 438, 443, 329 P.2d 1023, 1026 (1958). We see no reason to revisit that well-established New Mexico law regarding the Declaratory Judgment Act.

## The Significance of the *Ex parte Young* Doctrine

{12}  The *Alden* exception most important to our analysis of Gill's claim is *Ex parte Young*, which permits certain suits against state officers, but only for prospective injunctive or declaratory relief, or for monetary relief that is not sought from the state treasury. *See Alden*, 527 U.S. at 756–57, 119 S.Ct. 2240 (citing *Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. 441). Our Court of Appeals rejected Gill's *Ex parte Young* claim based on its understanding of the Supreme Court holding in *Kimel*, that Congress lacked the authority to abrogate state constitutional sovereign immunity through the ADEA. *Kimel*, 528 U.S. at 91, 120 S.Ct. 631; *see Gill*, 2003–NMCA–038, ¶ 12, 133 N.M. 345, 62 P.3d 1227.

{13}  According to the Court of Appeals, "[i]f the purpose of the *Ex parte Young* doctrine is to ensure the Constitution's supremacy, then a congressional act that is constitutionally outside of Congress's power to enact as against the states should not be permitted to be enforced against the states in any way, either in state or federal court." *Gill*, 2003–NMCA–038, ¶ 12, 133 N.M. 345, 62 P.3d 1227. We respectfully disagree. The Court of Appeals' analysis of the *Ex parte*

*Young* doctrine directly conflicts with *Alden* and *Cockrell*. If left intact, that analysis would inappropriately extend our state constitutional sovereign immunity beyond what is necessary to protect New Mexico's core sovereign interests, and beyond the bounds of "good faith" and the federalist compact, as described by the United States Supreme Court in *Alden* and by this Court in *Cockrell*, 2002-NMSC-009, ¶ 28, 132 N.M. 156, 45 P.3d 876 ("[C]onstitutional sovereign immunity 'does not bar certain actions against state officers for injunctive or declaratory relief.' ") (quoting *Alden*, 527 U.S. at 757, 119 S.Ct. 2240).

{14} Although a state's constitutional sovereign immunity prevents individual enforcement of certain federal statutes against a state, such as the FLSA claims at issue in *Alden* and *Cockrell*, that immunity does not undermine the basic *validity* of the legislation. Federal statutes enacted by Congress under its constitutional authority remain valid and in effect, even if they may not be enforced in all instances and against all defendants. *See Cockrell*, 2002-NMSC-009, ¶¶ 27-28, 132 N.M. 156, 45 P.3d 876 (noting that the application of constitutional sovereign immunity may sometimes result in federal rights without remedies); *Seminole Tribe*, 517 U.S. at 72, 116 S.Ct. 1114. Although the Supreme Court held in *Kimel*, 528 U.S. at 78, 120 S.Ct. 631, that individuals may not bring ADEA suits against states, the Court did not invalidate the ADEA or declare it unconstitutional.

{15} The ADEA was duly enacted under Congress' Commerce Clause authority. *See id.* States are subject to suit by the federal government for noncompliance. *Garrett*, 531 U.S. at 374, 121 S.Ct. 955. Individuals are subject to suit for damages under the ADEA. It remains valid legislation. *Kimel* did not overrule this authority, as we discussed in *Cockrell*, 2002-NMSC-009, ¶ 27, 132 N.M. 156, 45 P.3d 876 ("[T]he state is bound by the substantive provisions of the FLSA and is not free to disregard its obligations under federal law."). The only remaining question is what remedy is available when state officials violate federal law. We find nothing in *Alden*, *Kimel*, or *Cockrell* to support the Court of Appeals' conclusion that all ADEA claims are barred by state constitutional sovereign immunity, especially when they may fall into one of the limitations or exceptions recognized in *Alden*. This is particularly true of the *Ex parte Young* doctrine.

### *Ex parte Young* 's Origins

{16} In 1908, the United States Supreme Court held in *Ex parte Young*, 209 U.S. at 159-60, 28 S.Ct. 441 that the Eleventh Amendment generally does not preclude a suit brought against a state official in federal court for prospective equitable relief, even when the state is otherwise immune from suit. This doctrine, which the federal courts have applied for nearly a century, provides "a powerful tool for ensuring state compliance with federal law," without undue encroachment on state sovereignty. *Elephant Butte Irrigation Dist. v. Dep't of Interior*, 160 F.3d 602, 608 (10th Cir.1998).

{17} *Ex parte Young* claims were originally conceived as an essential tool for ensuring that constitutional guarantees would be enforced. *Alden* emphasized the importance of this exception to preserving the balance between state autonomy and the enforcement of constitutional rights:

> In particular, the exception to our sovereign immunity doctrine recognized in *Ex parte Young* is based in part on the premise that sovereign immunity bars relief against States and their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land.

*Alden*, 527 U.S. at 747, 119 S.Ct. 2240 (citation omitted).

{18} In 1997, the Supreme Court narrowed the *Ex parte Young* doctrine to exclude certain actions for prospective equitable relief against state officials that would impinge upon special sovereign interests. *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 283, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (holding that the state had a unique sovereign interest in submerged land within its borders, and therefore state officials could not be sued even under *Ex parte Young* ).

The previous year, in *Seminole Tribe*, 517 U.S. at 74, 116 S.Ct. 1114, the Supreme Court also held that an *Ex parte Young* suit against state officers was impermissible because the federal Indian Gaming Regulatory Act contained its own comprehensive, and exclusive, enforcement mechanisms.

{19} With these limited exceptions in mind, *Ex parte Young* retains its full vitality. Just last year, in *Verizon Maryland, Inc. v. Public Service Commission*, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), the Supreme Court allowed an *Ex parte Young* action under the federal Telecommunications Act. Distinguishing the Indian Gaming Regulatory Act, the Court noted that the Telecommunications Act does not contain a "detailed and exclusive remedial scheme like the one in *Seminole Tribe*." *Verizon*, 535 U.S. at 647, 122 S.Ct. 1753. The remedial scheme included in the ADEA, however, is comprehensive. *See* 29 U.S.C. § 626; *Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1366 (4th Cir.1989). The ADEA requires that individuals seeking redress for age discrimination in the workplace must first file charges with the EEOC. Gill complied with these remedial procedures by first filing with the EEOC, and filing suit after receiving a "Right to Sue" notice from the EEOC. Therefore, any injunctive relief Gill might obtain would be consistent with the comprehensive remedial scheme contemplated in the ADEA. Also, as we shall discuss shortly, prospective relief in the case at bar would not impinge upon core sovereign interests, of the kind discussed in *Coeur d'Alene Tribe*, 521 U.S. at 283, 117 S.Ct. 2028.

**The *Ex parte Young* Doctrine Endures as an Exception to State Sovereign Immunity**

{20} In *Kimel*, the Supreme Court did not expressly address the viability of injunctive relief to enforce the ADEA. But the Court subsequently spoke on the same subject, and clarified that the lack of a remedy for damages due to sovereign immunity and the Eleventh Amendment did not invalidate the ADEA as applied to the states. In *Garrett*, 531 U.S. at 356, 121 S.Ct. 955, state employees sued the university board of trustees under the ADA for failure to accommo-

date the disabled. Just as with the ADEA in *Kimel*, the Court found that the abrogation of sovereign immunity from suit under the ADA was not enacted pursuant to a valid exercise of the congressional power afforded in Section 5 of the Fourteenth Amendment. However, the Court explicitly stated that despite the failure of the law to abrogate constitutional sovereign immunity, *Ex parte Young* still offers a viable route for relief against the state for injunctive relief to enforce the law.

> Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover *money damages* against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation. Those requirements are not met here, and to uphold the Act's application to the States would allow Congress to rewrite the Fourteenth Amendment law laid down by this Court in *Cleburne* [*v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ].

*Garrett*, 531 U.S. at 374, 121 S.Ct. 955. In a footnote, the court then stated:

> Our holding here that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. *Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under Ex parte Young* ... In addition, state laws protecting the rights of persons with disabilities in employment and other aspects of life provide independent avenues of redress.

*Id.* at 374 n. 9, 121 S.Ct. 955 (emphasis added).

{21} This passage clarifies what had been left open in *Kimel*: that *Ex parte Young* remains a viable action for injunctive relief when damages are not available because Congress has failed to abrogate States'

immunity under Section 5 of the Fourteenth Amendment. It also emphasizes that federal laws like the ADEA and ADA remain applicable to the states, even though states are not subject to suit for money damages under these laws. Thus, as we have previously stated, the Court of Appeals' conclusion in Gill's case that Congress lacked the power to make the ADEA applicable to the states is incorrect as a matter of constitutional law. *See Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004) (upholding *Ex parte Young* prospective relief against state officers to vindicate federal law even though state sovereign immunity would preclude retrospective relief for money damages).

{22} The effect of Congress' failure to abrogate state sovereign immunity in the context of the ADEA was recently discussed in *State Police for Automatic Retirement Association v. DiFava,* 317 F.3d 6 (1st Cir. 2003). In *DiFava,* a Massachusetts law substantially lowered the mandatory retirement age for certain police officers. *Id.* at 8. In an appeal from a preliminary injunction preventing the state from forcing police officers to retire, the court addressed whether the ADEA remains applicable to the states after *Kimel,* the very question our Court of Appeals answered in the negative in regard to Gill. *DiFava,* 317 F.3d at 8. The *DiFava* court expressly rejected the contention that *Kimel* rendered the ADEA inapplicable to states, and upheld an injunction under *Ex parte Young* for prospective relief under the ADEA. *DiFava,* 317 F.3d at 11–12.

{23} *DiFava* also reinforced the understanding that the traditional exceptions to sovereign immunity continue in effect, even under federal legislation that fails to satisfy Section 5 of the Fourteenth Amendment. 317 F.3d at 12. "The Eleventh Amendment...does not confer upon the states a total immunity against suit." *Id.*; *Alden,* 527 U.S. at 755, 119 S.Ct. 2240. Therefore, legislation that does not satisfy Section 5 may nevertheless be enforceable against the states in other ways. In *Cockrell* this Court described several alternative forms of recourse available to plaintiffs despite the existence of constitutional sovereign immunity,

including "certain actions against state officers for injunctive or declaratory relief." 2002–NMSC–009, ¶ 28, 132 N.M. 156, 45 P.3d 876 (quoting *Alden,* 527 U.S. at 757, 119 S.Ct. 2240). No heightened immunity is bestowed upon states by virtue of a finding that Congress cannot abrogate state immunity in a given statute. Instead, states maintain the same degree of immunity from suit by private individuals seeking money damages. This immunity is subject to certain exceptions and limitations, such as state consent to suit, or enforcement of the act through an action initiated by the United States, or an equitable action under *Ex parte Young.*

### *Ex parte Young* Applies in State Court

{24} *DiFava* and *Garrett* applied *Ex parte Young* in federal court, not state court. *Alden* confirms that *Ex parte Young* also applies in state courts. In restating that *Ex parte Young* applies in state courts, an idea first articulated nearly 100 years ago in *General Oil Co. v. Crain,* 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754 (1908), the *Alden* Court described the importance of maintaining the *Ex parte Young* doctrine:

> In particular, the exception to our sovereign immunity doctrine recognized in *Ex parte Young* is based in part on the premise that sovereign immunity bars relief against States and their officers *in both state and federal courts,* and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land.

*Alden,* 527 U.S. at 747, 119 S.Ct. 2240 (emphasis added). *Alden* goes on to state, "[h]ad we not understood the States to retain a constitutional immunity from suit in their own courts, the need for the *Ex parte Young* rule would have been less pressing, and the rule would not have formed so essential a part of our sovereign immunity doctrine." *Id.* at 748, 119 S.Ct. 2240 (citing *Coeur d'Alene,* 521 U.S. at 270–71, 117 S.Ct. 2028).

{25} Limited exceptions to sovereign immunity are needed to maintain pathways for individuals who have suffered damages due to violations of federal law by state officials. The use of the *Ex parte Young* fiction is an

attempt to strike a balance between respect for the dignity and autonomy of the state, and the need to maintain the supremacy of federal law. Encroachment into state autonomy is minimized, while valid federal law maintains a meaningful presence within state government. Several post-*Alden* state cases confirm that *Ex parte Young* is available in state court as an exception to sovereign immunity. *See Middleton v. Hartman*, 45 P.3d 721, 727 (Colo.2002) (citing *Ex parte Young* as one of six exceptions to the doctrine of sovereign immunity, the court held that because the state would not be liable for damages, except for those damages it had voluntarily assumed, a suit for prospective injunctive relief was not barred by constitutional sovereign immunity); *Purvis v. Williams*, 276 Kan. 182, 73 P.3d 740, 749 (2003) (stating that an *Ex parte Young* suit for prospective injunctive relief is one of "three ways state immunity may be relinquished" in Kansas); *see also Connelly v. State Highway Patrol*, 271 Kan. 944, 26 P.3d 1246, 1259 (2001); *Prager v. State Dep't of Revenue*, 271 Kan. 1, 20 P.3d 39, 55 (2001); *Brown v. Div. of Motor Vehicles*, 155 N.C.App. 436, 573 S.E.2d 246 (2002) (acknowledging the availability of an *Ex parte Young* action brought under the ADA in state court).

{26} We hold that the *Ex parte Young* doctrine does apply to suits brought in New Mexico state courts to enforce rights validly created under federal law. We now turn to the procedural requirements of this doctrine: (1) the plaintiff must allege an ongoing violation of federal law; (2) the suit must not implicate special state sovereignty interests; (3) the relief sought must be prospective and injunctive; (4) the suit must be directed at officers of the state, and not the state itself.

## The Alleged Conduct Violated Federal Law

{27} According to a recent U.S. Supreme Court opinion, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law..." *Verizon*, 535 U.S. at 645, 122 S.Ct. 1753 (explaining that the inquiry into whether suit lies under *Ex parte Young* does not include analyzing the merits of the claim) (internal quotation marks and citation omitted). Because the ADEA remains applicable to the states, the straightforward inquiry described in *Verizon* applies in this case. To make a prima facie showing of an ADEA violation, Gill must establish that he was treated adversely in his employment because of his age, and that he was at least 40 years of age at the time of the alleged discrimination. *See* 29 U.S.C. §§ 623, 631(a). Pursuant to Section 10–11A–2(E) (prior to 2003 amendment), Gill was denied retirement benefits based solely on his age. The district court granted PERB's motion to dismiss based on constitutional sovereign immunity, without reaching the merits of the complaint. We are satisfied that Gill's complaint, on its face, sufficiently alleges an ongoing violation of the ADEA.

## The Suit Must Not Implicate Special State Sovereignty Interests

{28} Even if a party brings an otherwise appropriate *Ex parte Young* action, constitutional state sovereign immunity can still bar suit if the requested relief is "far reaching and intrusive" on core state functions or "an impermissible affront" to the state's political authority. *Elephant Butte*, 160 F.3d at 612–13; *Coeur d'Alene Tribe*, 521 U.S. at 281–83, 117 S.Ct. 2028. Two federal cases have used the special sovereign interests criteria to carve out specific exceptions to the *Ex parte Young* doctrine. In *Coeur d'Alene Tribe*, 521 U.S. at 281–83, 287, 117 S.Ct. 2028, the Supreme Court ruled that a state's interest in its submerged lands was a sufficiently special state sovereign interest to bar an *Ex parte Young* action. In *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1194 (10th Cir.1998), the Tenth Circuit found a state's property tax scheme to be a sufficiently special state sovereign interest to bar relief. More recently, the Tenth Circuit has explained that the *Coeur d'Alene Tribe* and *ANR Pipeline* reflect extreme and unusual cases in which relief may be denied because of "particular and special circumstances" that

affect "special sovereignty interests" and cause "offense to [the state's] sovereign immunity." *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1286–87 (10th Cir.1999).

{29} Most *Ex parte Young* cases do not implicate core state functions, and therefore "[t]he interest of vindicating the federal rights and answering the federal questions involved substantially outweigh the state's sovereign interests." *Elephant Butte,* 160 F.3d at 613. Outside of land use and taxation, numerous cases have employed the *Ex parte Young* remedy in a variety of contexts, including management of social and educational programs, welfare distribution, management of trust lands, and the re-appropriation of surplus funds. *See, e.g., Joseph A. ex rel. Corrine Wolfe v. Ingram,* 275 F.3d 1253, 1260–61 (10th Cir.2002) (holding that welfare distribution is not a core sovereign interest comparable to power to tax); *Harris v. Owens,* 264 F.3d 1282, 1293–94 (10th Cir.2001) (holding that funds requested by plaintiff prior to their entry into the treasury was not the equivalent of an appropriations bill, and "[t]he state's interest with respect to these future funds is not related to appropriations but to revenue sources, an interest we have rejected as sufficiently special to serve as an exception to *Ex parte Young*"); *Lewis v. N.M. Dep't of Health,* 261 F.3d 970, 978 (10th Cir.2001) (administration of Medicaid program is not core sovereign interest); *Ellis v. Univ. of Kan. Med. Ctr.,* 163 F.3d 1186 (10th Cir.1998) (concluding that a limitation on state medical residency criteria for school admission is not a special sovereignty interest and does not threaten existence of state government); *Branson Sch. Dist. RE–82 v. Romer,* 161 F.3d 619, 632 (10th Cir.1998) (holding that the state has no special sovereign interests in managing lands held in trust).

{30} We are not persuaded that Gill's ADEA claim presents an impermissible affront to New Mexico's special sovereign interests or its political autonomy. We observe that New Mexico created a state remedy for age discrimination through the New Mexico Human Rights Act that affords victims back wages and other monetary relief. *See* NMSA 1978, §§ 28–1–7(A), –2(A) (1993); *Elephant Butte,* 160 F.3d at 613. Gill's claim under *Ex parte Young,* being only for prospective, injunctive relief, may well have a lesser impact upon the state treasury than what the state has already authorized under state law.

## The Relief Sought is Prospective and Injunctive

■ {31} In oral argument before this Court, Gill conceded that under an *Ex parte Young* theory of relief, he could only seek an injunction to require payment of future retirement benefits, not retroactive damages for past benefits. This is an important distinction, both to the law and to the viability of Gill's claim. Nonetheless, PERB characterizes Gill's claim as "a direct raid on the state's treasury," and argues that monetary relief of any kind is not available under the *Ex parte Young* doctrine. We acknowledge that even injunctive relief may have some impact upon the state treasury. Under the leading precedent, however, the pertinent inquiry is not whether the relief will require the incidental payment of state funds, but whether the relief will remedy future rather than past wrongs. *See Elephant Butte,* 160 F.3d at 611.

■ {32} *Ex parte Young* actions for prospective relief have been allowed, even when such an award would have a "substantial ancillary effect on the state treasury." *ANR Pipeline,* 150 F.3d at 1189; *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 96, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Ex parte Young* ). For example, in a case involving the denial of supplemental social security income benefits, the Tenth Circuit disallowed retroactive monetary reimbursement for federal benefits withheld by the state, but held that recipients could seek prospective injunctive relief against *future* withholdings. *Johns v. Stewart,* 57 F.3d 1544, 1553–55 (10th Cir.1995). Although courts should be circumspect regarding requests for monetary relief in an *Ex parte Young* action, "relief that serves to directly bring about an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the

state treasury." *Harris,* 264 F.3d at 1291 (quoting *Papasan v. Allain,* 478 U.S. 265, 278, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

▓▓ {33} We also disagree that Gill's claim is a "raid on the state treasury." The Volunteer Firefighter's Retirement Fund (VFRF), which PERB oversees, and from which it would pay Gill's claim, is segregated from the state general fund and from all other state retirement funds. *See* NMSA 1978, § 10–11A–3 (1997) (forming a separate retirement fund allocated on a static basis). Furthermore, unlike other PERA funds, the VFRF is not appropriated on an actuarial basis. VFRF's appropriation in any subsequent year will remain unchanged, regardless of whether PERB is forced to provide Gill with benefits. In fact, the state is prohibited from reclaiming any surplus funds in the VFRF at the end of the fiscal year. *See* Section 10–11A–3(B) (1983), and 2002 supp. comment on "Appropriations"; *cf.* NMSA 1978, § 21–8–5 (1953), and 2000 supp. comment on "Appropriations" (providing that unexpended university funds shall revert to the general fund).

{34} We conclude, therefore, that Gill is seeking permissible prospective, injunctive relief that would only have an ancillary effect on the state treasury. He is asking the court to enjoin future violations of the ADEA. If compliance with federal law also brings some financial benefit to Gill, that hardly constitutes an impermissible raid on the state treasury, such that we would turn a blind eye to Gill's predicament and New Mexico's constitutional obligation to comply with federal law. Speaking very recently, the United States Supreme Court reinforced the prospective versus retrospective relief distinction,

> The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent. To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. This standard allows courts to order prospective relief, as well as measures ancillary to appropriate prospective relief. Federal courts may not

award retrospective relief, for instance money damages or its equivalent, if the State invokes its immunity.

*Frew,* —— U.S. at ——, 124 S.Ct. at 903 (citations omitted).

### The Proper Party Defendants

▓▓ {35} Traditionally, *Ex parte Young* suits name one or more individual state officers to be sued in their official capacities. *Verizon,* 535 U.S. at 645, 122 S.Ct. 1753. The purpose of naming an individual officer in an *Ex parte Young* claim is to identify the party whose conduct violated federal law, and more importantly to ensure that future conduct conforms to federal law. The focus of determining if an action fits into the *Ex parte Young* rubric is not simply the identity of the named party, but whether the State is the real party in interest and thus, whether a suit might intrude upon the sovereignty and autonomy of the State. It has been consistently noted that, "*Young*'s applicability 'is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record.'" *Coeur d'Alene,* 521 U.S. at 278, 117 S.Ct. 2028 (Kennedy, J.) (quoting *In re State of New York,* 256 U.S. 490, 500, 41 S.Ct. 588, 65 L.Ed. 1057 (1921)).

▓▓ {36} Mr. Gill's *Ex parte Young* action is directed towards PERB, not toward a state official or officials. *Elephant Butte,* 160 F.3d at 609. Instead, Mr. Gill appears to argue that, because PERB is made up of individuals, he need not name them as such, emphasizing that a majority of a quorum is necessary for a PERB decision. We disagree. The requirement that a plaintiff must sue a state official in an *Ex parte Young* claim remains an integral component of the *Ex parte Young* construct.

▓▓ {37} However, Gill may still move to amend his complaint pursuant to Rule 1–015(C) NMRA 2004. This rule permits an amendment to a party named in a suit to relate back to the date of the original pleading if the parties named in the amended pleading received notice of the action, and knew or should have known that, but for a mistake concerning the identities of the prop-

er parties, the actions would have been brought against them originally. Rule 1–015(C). Because the individual members of the PERB apparently were on notice of this proceeding, and because the claim to be asserted in the amended pleading would arise "out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading," Gill may move to amend his claim to add the individual members of the PERB. We therefore remand to the district court to allow Gill to move to amend his complaint pursuant to Rule 1–015 NMRA 2004.

**CONCLUSION**

{38} For the reasons stated, we reverse the Court of Appeals and remand this case to the district court for further proceedings consistent with this opinion.

{39} **IT IS SO ORDERED.**

PETRA JIMENEZ MAES, C.J., PATRICIO M. SERNA, J., and EDWARD L. CHAVEZ concur.

PAMELA B. MINZNER, J., specially concurring.

MINZNER, Justice (specially concurring).

{40} I concur in the majority opinion but write separately in order to emphasize the importance I place on the analysis in *Cockrell v. Board of Regents of New Mexico State University*, 2002–NMSC–009, 132 N.M. 156, 45 P.3d 876, in reversing the Court of Appeals. Further, I believe the opinion of the Court of Appeals, as did the opinion in *Cockrell*, recognized an important anomaly within the body of case law we apply. I am persuaded that we adopted an approach in *Cockrell* we should continue to pursue.

{41} In *Cockrell*, we discussed the effect of several opinions by the United States Supreme Court on issues of federalism. We concluded that these opinions have determined that each State enjoys a form of constitutional sovereign immunity, and this unique constitutional immunity precludes Congress from providing for enforcement against a state absent its consent. *Id.* ¶ 8. As we noted in *Cockrell*, however, the United

States Supreme Court also indicated that a statute Congress may not make enforceable against a State, absent its consent, nevertheless can continue to be "binding on the States pursuant to the Supremacy Clause of Article VI of the Constitution." *Id.* ¶¶ 5, 27.

{42} We specifically said in *Cockrell*,

[W]e do not believe that it is within this Court's province to decide whether the State should subject itself to liability for a federal claim filed in state court. Under the principle of separation of powers embodied in Article III, Section 1 of the New Mexico Constitution, we believe this is a matter for the Legislature. Unlike the decision "to do away with common law principles," [*Hicks v. State*, 88 N.M. 588, 590, 544 P.2d 1153, 1155 (1975)], which is within this Court's power, the decision to waive this State's constitutional sovereign immunity would represent an alteration of the constitutional balance of power between the Federal Government and the State of New Mexico that was struck by the Supreme Court in *Alden [v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ].

*Id.* ¶ 13.

{43} Our opinion in this case might appear inconsistent with this portion of *Cockrell*. In applying *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) to the facts of this case, reversing both the trial court and the Court of Appeals, and recognizing a private enforcement claim, we may appear to be in effect exercising the Legislature's prerogative to determine when or under what circumstances New Mexico will permit itself to be sued in its own courts on a federal claim, notwithstanding the constitutional sovereign immunity the United States Supreme Court has so carefully and recently articulated. After all, we noted in the above passage that the United States Supreme Court had struck a balance of power between the Federal Government and the State of New Mexico, a balance that preserved the Legislature's power to waive the State's immunity and under the principle of separation of powers that is part of the New Mexico Constitution limited our own.

{44} *Cockrell* itself seems to me to hold the answer to any apparent inconsistency. The constitutional sovereign immunity that the United States Supreme Court has articulated so recently is limited. We made this point in *Cockrell* several times. We said, for example: "[I]n the *limited context of a private action for money damages* authorized by a federal statute, 'the States do retain a *constitutional immunity* from suit in their own courts.' " 2002–NMSC–009, ¶ 11, 132 N.M. 156, 45 P.3d 876 (first emphasis added) (quoting *Alden,* 527 U.S. at 745, 119 S.Ct. 2240). We also said: "This State, by virtue of its sovereign role in the Union, is constitutionally immune from *private suits for damages* under a federal statute." *Id.* ¶ 15 (emphasis added). Finally, we said: "We hold that the State has not waived its constitutional sovereign immunity from *private suits for damages* based on a violation of federal law." *Id.* ¶ 29 (emphasis added).

{45} Consequently, we have indicated our understanding that the Legislature's power to waive New Mexico's constitutional sovereign immunity is the power to decide whether to expose the State to liability for money damages for violations of federal law. Whether the doctrine of *Ex parte Young* applies is a decision that the Court explicitly and appropriately reserved for itself. In *Cockrell,* we stated:

> Despite the existence of the State's constitutional sovereign immunity, state employees who do not receive the benefits to which they are entitled under the FLSA are not without recourse.... [C]onstitutional sovereign immunity "does not bar certain actions against state officers for injunctive or declaratory relief."

2002–NMSC–009, ¶ 28, 132 N.M. 156, 45 P.3d 876 (quoting *Alden,* 527 U.S. at 757, 119 S.Ct. 2240).

{46} It does seem to me that in applying *Ex parte Young* to the facts of this case, we are extending an historic doctrine beyond its historic limits. *See generally* 1 Laurence H. Tribe, *American Constitutional Law* § 3–27, at 555–56 (3d ed.2000). In the past, the doctrine of *Ex parte Young* has permitted suits in federal courts against individual state officers on the basis that when acting illegal-

ly, those officers should be viewed as stripped of the immunity they otherwise would enjoy as representatives of a sovereign state. *Id.* In this case, the Board acted, from its perspective, legally. The Board members certainly acted consistently with and in reliance on a state statute. In this case, we in effect declare action taken pursuant to a state statute illegal, if it conflicts with a federal statute. As the majority opinion points out, we are not alone in recognizing that *Ex parte Young* can apply to an action taken in state courts. *Id.* ¶ 25. The most difficult question for me has been whether we ought to equate the Board's action with the conduct to which the *Ex parte Young* doctrine historically has applied, but I also have found it difficult to determine whether the claim asserted in this case is in fact a claim for prospective, injunctive relief within the scope of the doctrine. *See Gill v. Pub. Employees Ret. Bd.,* 2003–NMCA–038, ¶ 10, 133 N.M. 345, 62 P.3d 1227.

{47} The Court of Appeals seems to me to make a valid point in suggesting the historical anomaly of relying on *Ex parte Young* to preserve the supremacy of federal law in a state court when some of the language in the federal cases suggests Congress lacked the power to make the law supreme or, put another way, that a state's constitutional sovereign immunity is an equally important principle of constitutional law, which inherently limits the reach of federal law. *See e.g. Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In *Kimel* the Court held "that the [Age Discrimination in Employment Act] is not a valid exercise of Congress' power under § 5 of the Fourteenth Amendment" and that therefore the "purported abrogation of the States' sovereign immunity is accordingly invalid." *Id.* at 91, 120 S.Ct. 631. If, by that language, the United States Supreme Court meant to say that Congress had the power to enact legislation that is binding on the States but not the power to make it enforceable, Congress' power must be limited, even if supreme. We noted this anomaly in *Cockrell.* There we said that "[w]e recognize[d] the incongruity of the State's obligation to pay overtime wages ... without a concomi-

tant method of enforcement for employees." *Cockrell,* 2002–NMSC–009, ¶ 27, 132 N.M. 156, 45 P.3d 876.

{48} The Court of Appeals opinion elegantly refers to the tension within the case law in a single sentence: "*If* the purpose of *Ex parte Young* doctrine is to ensure the Constitution's supremacy, then a congressional act that is constitutionally outside of Congress's power to enact as against the states should not be permitted to be enforced against the states in any way, either in state or federal court." *Gill,* 2003–NMCA–038, ¶ 12, 133 N.M. 345, 62 P.3d 1227 (emphasis added). I understand the Court of Appeals to be observing, correctly, that *Ex parte Young* began as a protection of the supremacy of the United States Constitution. If the Constitution limited Congressional power to make federal legislation applicable to the states, then it *should* be the case (not necessarily *is* the case) that the *Ex parte Young* doctrine, a constitutional concept, would not be available to facilitate what Congress otherwise did not have the power under the Constitution to accomplish.

{49} Again, I think *Cockrell* addresses and helps resolve what would otherwise be an unbearable tension. Because the constitutional sovereign immunity the United States Supreme Court has so recently articulated is limited to an immunity from money damages, and does not preclude suits for injunctive relief, Congress' power in enacting remedial legislation is not as limited as the language in *Kimel* suggests. Because State constitutional sovereign immunity is limited, Congress' power to enact remedial legislation can be understood to include· the power to make that legislation enforceable in actions to which a State is not immune. For this reason, we ought not foreclose the suit before us on the basis of constitutional sovereign immunity. Having recognized the federal cases as articulating a limited constitutional sovereign immunity, we are able to recognize the viability of the present claim. The federal statute on which this claim rests continues to have validity in state court, to the extent the State is not immune as a matter of federal constitutional law. The complaint stating the claim should not have been dismissed, because we should equate the Board's conduct with the conduct to which *Ex parte Young* historically applied.

{50} Nevertheless, the balance to which we referred in *Cockrell* is a balance not only between Federal and State power but also between legislative and judicial power. If we are careful in applying *Ex parte Young,* we can respect the Legislature's exclusive power to waive the State's constitutional sovereign immunity without surrendering our own power to recognize the development of the *Ex parte Young* doctrine in an appropriate way. For the reasons stated in the majority opinion, I believe we are extending the *Ex parte Young* doctrine consistent with United States Supreme Court precedent, although injunctive relief can be every bit as onerous a burden on the state and its treasury as the potential exposure of the state to monetary damages. *See* Pamela S. Karlan, *The Irony of Immunity: The Eleventh Amendment, Irreparable Injury, and Section 1983,* 53 Stan. L.Rev. 1311, 1314 (2001) (arguing that "injunctive relief may turn out to be far broader and more intrusive than the damages that would have been available after the fact, both because it may involve more invasive judicial supervision of state entities and because some of the defenses that would be available in after-the-fact-litigation, most notably qualified immunity, are unavailable in cases seeking prospective relief"). What has helped me distinguish this case from *Cockrell* is the existence of a separate fund against which the claim has been made, making it possible to characterize the relief sought as prospective, injunctive relief, "that would only have an ancillary effect on the state treasury." Majority Op. ¶¶ 33, 34. In *Cockrell,* on the other hand, the plaintiff sought money damages for breach of a state statute, which I assume would not have had an ancillary effect on the state treasury. 2002–NMSC–009, ¶ 1, 132 N.M. 156, 45 P.3d 876. The distinctions we are making may seem thin, but the analysis that results from those distinctions is consistent with *Cockrell* and seems to permit us to reconcile conflicting language and ideas within the federal cases. On that basis,

and on the basis of the analysis contained in the majority opinion, I concur.